Thank you. Please be seated. Good morning, everyone. We have four argued cases on the calendar this morning, and we have one case on submission. The submitted case is Solomon v. St. Joseph Hospital, and we will take it on submission. I've been advised by the deputy clerk that everyone is present and ready to argue in all four of the cases, so I'm going to dispense with reading the calendar this morning. The first case is Black v. Buffalo Meat Service. We're ready to proceed. Good morning, Your Honor. First, I'd like to apologize for not immediately standing up. I was reading my notes, and I flipped off. I would like to rely on my points. With regard to pay disparity, I think it's really important, because of the bankruptcy issue, to know when Black became aware of these things. Black didn't become aware, Ms. Black didn't become aware, that there was pay disparity until well after the bankruptcy was filed and after it had been discharged. She found out when Debbie Nygridge, a female manager who was also complaining of being paid less than males, actually ones that had been there less time than her and lesser positions. And she told Ms. Banks about it, and also about the fact that the insurance, that they weren't paying her because they said they were paying her insurance. And I think it's important, too, that we pay particular attention, I think it is crucial to this case, to the statement that was signed by Robert Siebert and Diane Siebert and was written and prepared with Keegan Roberts. It's important that you remember Mr. Roberts, because he was, soon after became the third owner, but he was treated, he had the power to hire, to fire, to do all of those things. He helped prepare this letter. And the interesting thing about this document is when you read it, it's at A938 to A942. When you read it, you see how they're writing it without the advice of counsel, and I'm saying that disparage, I'm just saying, without being represented, and what they're saying. And it's very interesting. One of the most, the pay disparity, the argument is, they're not substantially the same, because you'll see even in counsel's brief to this court, she is a counterperson. Yet, when they wanted to negate, and by that I mean the Sieberts and Keegan Roberts wanted to negate to the EEOC that, in fact, she was in the back room and wasn't a counterperson, so she couldn't have known that no African Americans were being interviewed or hired, even though 60 or 70 percent of their client base was African American, and the only way they advertised for a position was putting it up in their actual building. So when you entered, you saw they were looking for a position. They said in this document that she wouldn't know that. She, and this is a quote, she, as a rule, worked in the PAC room in the rear of the building, which has no windows. That's not a counterperson. And throughout here, you see things that show the discriminatory animus and bias. They said, when they were talking about hiring people, that if they had a job that required organizing freezers or putting loads away, which requires heavy lifting, we would discard females as a rule. Didn't matter their size or their ability. My client was a bigger woman. And they would discard older males. And they would discard anyone with a back problem. And this document, throughout, demonstrates discriminatory animus. Can I just ask, to make sure I'm understanding the record correctly, Diane Siebert said that the shop hired employees to do work, and you cite that point in your brief, and that the shop is not specific when they're hired. But didn't she also then say they kept track of what they did? What happened, as best I can tell, it's very interesting, because that's something else very important. After council, they submit a with these alleged people who are counter people. And all these employees, they say, oh, she's the same as all of them. Well, important thing is, it's not signed or verified by anyone. There's no affidavit about it. There's no declaration. There's a real reason they can't do a declaration for that. This is my opinion only. Because you'd have to have them swear to fact, which are not true. We know from the employment and pay records that they're saying that people started on a certain date, and in fact, they were there five years before. My client was a physical breathing person who was physically there. Patrick House, how was he invited to her wedding? She doesn't socialize with, doesn't know him, nothing, right? She said he worked with her in the pack room. We provided wedding pictures showing him at her wedding. She invited people that were employees there. Now, how would she know whether they paid him on the books or off the books? She just knew that when construction season ended, he came and he worked in the pack room like everybody else. There's many instances, but it was very hard to catch these. For example, because if they knew you were going for someone, so I found in the pay records one pay record for somebody named Metropolis. And the interesting thing about Metropolis was he was a butcher. So when she saw his name, she said, wow, there's only one pay stub. He came in and worked as a butcher. And I said, well, there's only one pay stub. So when the butcher came, Tom House came to testify, I asked him. Now, mind you, the Metropolis's names was not in the papers I had had before. I said to him, do you know a person by the name of Metropolis? He said yes. Did he work as a butcher? Yeah, he came in and I knew him from somewhere else. And when was he there? What years? There's more examples in our papers. Can I ask you to address, I heard the argument you began with that your client didn't learn of the pay disparity that she alleges until after the bankruptcy closed. But what about the hostile work environment claim? And that's the interesting thing with the bankruptcy versus the hostile work environment. Rooted versus substantially related under Morgan. They're totally different standards. Title VII, and none of the cases that they've cited that say that it was rooted in, you know, that say the bankruptcy, that this case should have been rooted in the, during the time of the bankruptcy, none of those cases talk about our facts. Every single one of those cases, they refer to a different name, like had a company, change the name of the company. Unquestionably in those instances, the debtor knew. I have a minimum wage person working in a butcher shop who is so indigent that she in fact has to get a second job part-time, which they say was she was leaving them. No, she needed more money. A second job part-time. She, you know, had some training in her prior jobs. There's no policies there, no training, nothing. She didn't even know you could sue somebody for discrimination if you worked for them, and she had no intention of leaving. She was aware of these comments, but the pinnacle moment was when they said them relative to her children. As a mother of these children. Yes, Judge, I'm sorry. No, it's okay. So is the argument that the claim didn't accrue until that point, until the subsequent bankruptcy incident? With regard to Title VII, there was no unlawful employment action that accrued. If not, you're going to open the floodgates. If this court determines that in fact, if you're disgruntled or you think there could be something going on, you've got to put them in bankruptcy, get ready. And I tell you that as a long-time 40-year practitioner, there's a lot of people that contact plaintiff's attorneys to see whether they're even interested in their case. And I will tell you on my own personal experience, 99% plus, I don't think. There are lots of, this court has talked about disgruntled people. But here's somebody who's trying to work through it. Not that it's not offensive to her, and that's what the whole unlawful employment action- It seems like you're trying to have it both ways then. If it's not enough for purposes of judicial stop of bankruptcy, but then it is enough to account for a hostile work environment after the fact when you learn something new, that's your position. But it's different. One is rooted in it. And another is, you can have these acts. And when that ultimate act happens, like here- You said rooted in it? So two different standards. One is rooted in it, which is a bankruptcy standard. And there's a good case that talks about that, the one with the device. There was a device, or a match, I can't remember. There's a device that was put in this plaintiff. And she filed bankruptcy, she had no idea about it. And then later learned that it could be a problem. That's when the action accrued under propriety liability. This is the Eastern District case decided by Judge Bianco, I believe. Mendelsohn? Yeah. So, they're just different. And I think the judge can- The judge didn't really address rooting, in my opinion, the way it should have been addressed. I think this is a really important point. A really important decision for this court. I have a simple question for you, Ms. Greco. Yeah. Tell us what you expect to achieve within this litigation. That is, what decree from this court do you seek? What is it that we should do, and why? I think this court should determine that it's not rooted in the bankruptcy proceeding. Now, I'll tell you what I did. I did hire- No, I'm a very uncomplicated sort of person. I simply want to know, if you prevail here, what does our order or decree provide you? Who is getting what from us? Oh, no. I'm sorry, Dan. I barely understand. No, no. Very simple. Uncomplicated. So, if you send- This court would send it back, and we would be able to- With what instructions? The instructions for- This is to the district court. Yes. Instructions that it's rooted. The decision that- Don't give me doctrine. Just tell me, what do you want the district court to do? Once the district court has the mandate, what is the district court supposed to do in these circumstances? Set up a trial. But vacate the decisions. And the reason is, and I also would ask the court to make a decision about rooted versus substantially related. Because I couldn't find a case- Now, I'm not saying I'm ruling, but I could not find a case to give you that would talk about, you know, whether a morgue is substantially related. When the seminal act, which I call the rooting act, occurred after the petition was filed, after the discharge was filed, and she couldn't possibly imagine he was going to say that about our children. And then, another important part of this case is what happened when Robert Siebert met with her. He was on vacation. She went to Robert, who was the guy in charge. And he basically, I mean, Diane Siebert testified she didn't believe Darcy. Why? Darcy Black went to work every day, did her job, did everything. The person she believed was late 70 times. My client said he smoked pot behind the dumpster and people laughed about it. I mean, how does my client know these things? I was able to take, like, the guy who she said was off the books, and then, all of a sudden, she only knew that his grandmother's house was coming on the market because of the estate, and he had to buy it. And he said, if that's a comparator, he was going on the books because he needed it to get a mortgage. I mean, she had information, and that's why we're here. And there are questions, in fact, that have to be determined. Ms. Greco, you reserve two minutes of rebuttal time. And you could use them now, but you may want to reserve them. And I would just like to rely on my other points. Sorry. We'll hear from the athlete. Do I stand or stand? I'm not used to this. She's on Zoom. Good morning, Your Honors. Before I begin, guys, I did get off. Yes, we're having trouble hearing you. Just a moment. Why don't you test it, counsel? Just say a few words of introduction of yourself, so we can see whether it comes out. Test one, two, three. A couple more sentences. Who are you, and why are you here? Good morning, Ms. Desaria. From the law firm. Counsel for Appellee's Buffalo Meat Service. Is that any better, Your Honors? Keep talking. You're still going in and out a little more. If we can't get the feed well enough, we may have to put this at the end of the calendar and finish the case after we've heard the other cases and ask that the IT people give us some help. I apologize to the court for this inconvenience. I did just switch my camera and put my headphones in, and I'm wondering if you're able to hear me better. Now you're perfect. Perfect. All right. Thank you. I do apologize to the court. I was on the Zoom, and I cleared it with the clerk when I jumped on this morning, and then I got kicked off on my computer and frantically joined from my cell phone. So I apologize. We can hear you well now, so please proceed. Thank you, Chief Judge Livingston. May it please the court, my name is Ariana Kwiatkowski, an attorney at Barclay-Damon LLP, counsel for Appellee's Buffalo Meat Service, Diane Siebert, Robert Siebert, and Keegan Roberts. I wanted to begin my argument this morning, Your Honors, with a discussion of the pre-bankruptcy allegations and claims in this case and the applicability of the twin legal principles of standing and judicial estoppel to those claims. And I think Judge Park really hit the nail on the head when he asked my colleague a question about having it both ways, because the full integrity of the bankruptcy system relies on the complete and full disclosure of a debtor's assets, including all claims. As we pointed out in our brief, Your Honors, claim is defined broadly under the bankruptcy statute, and it means any payment, whether liquidated, unliquidated, matured, unmatured, a debtor has a duty to disclose all claims, which then become the property of the bankruptcy estate, and only the trustee has standing to pursue those claims. Likewise, Your Honors, judicial estoppel has also been applied in this context, as we pointed out in our brief. The purpose of judicial estoppel is to prevent inconsistent positions taken between the bankruptcy court and in subsequent litigation. I think it's very important to point out that a debtor does not necessarily need to have perfect knowledge or complete knowledge of all the legal causes of action or facts or legal basis for a cause of action. If the debtor has enough information to suggest that it may have a possible cause of action, then that cause of action is a known claim under the bankruptcy law and must be disclosed to the bankruptcy court. Well, how do we think about that in the context of the hostile work environment claim here? I mean, the most significant evidence for that claim, there were incidents that are pointed to that were before the bankruptcy, but probably the most significant evidence occurs after the bankruptcy. Yes, Chief Judge Livingston, thank you. So with respect to the post-bankruptcy, and I'll just jump right to it, and before I get there, if I may, I did want to just, my colleague had noted that she was not aware of any disparate pay claim until after her bankruptcy had closed. And I did just want to address that very briefly, if I may, before I turn to the hostile work environment question you asked me, Chief Judge Livingston. That allegation is simply belied by the proof in the record appendix. Ms. Black testified at her own deposition that her equal pay claims began in 2006. In the charge she submitted to the EEOC, she alleged that one of her colleagues, Round, was hired in 2005, and that he was paid more per hour for her. These were all pre-bankruptcy. This happened pre-bankruptcy, Chief Judge Livingston, and I did want to point that out. But turning to the hostile work environment claim, did Your Honor want me to address the basis of race on the basis of sex, or both? Well, both. I mean, there is some case law support where you can consider both race and sex together in the context of a hostile work environment claim, as you know. Yes. Understood, Chief Judge Livingston. So first, if I may, I will address the hostile work environment claims under Title VII with respect to Jennifer. So as I pointed out, in the record, there is enough evidence here that the District Court respectfully, correctly determined that the gender-related claims were substantially related to the pre-bankruptcy activity. I did want to point out for the Court that with respect to hostile work environment, the only allegations in the record that the defendants engaged or created a hostile work environment on the basis of gender is the three comments that are identified at paragraph 33 of the complaint, and Ms. Black confirmed that at her deposition. Respectfully, Your Honor, those complaints are not, they're not angered in time. Ms. Black testified she could not remember when they occurred, but that they occurred throughout her employment. So if that is the case, then they did occur or are substantially related to pre-bankruptcy activity, and the plaintiff lacks standing or is judicially stopped from pursuing them. With respect to the disparate treatment claim under Title VII, Your Honor, this is also a similar argument. Ms. Black testified that she was treated not as well as male employees from the time she began working, so throughout her entire employment. And as the District Court pointed out, with respect to some of these claims, she did not, she could not identify when they occurred. Some were definitively pre-bankruptcy, some Ms. Black could not remember when they occurred, and if that's the case, they are substantially related and equally stopped from being brought in this action. I did want to address as well the Equal Pay Act claim. If I may briefly, the District Court determined that that claim was time barred as a matter of law. We respectfully submit that's correct, because with respect to the Equal Pay Act claim, if plaintiff's last paycheck would have been in May 2010, and she did not commence this action until five years later, and that is either a two- or three-year statute of limitation. With respect to Title VII and the constructive discharge claim, which I believe is what Chief Judge Livingston, you are getting at, and the comment that was allegedly made by LaPresse concerning the plaintiff's children, the District Court essentially said that that comment made by LaPresse was not substantially related, and therefore was too pre-bankruptcy conduct, and therefore that plaintiff was not stopped or did not lack standing to pursue that claim. If that is the case, Your Honor, and this correct agrees with the District Court, that allegation should be looked at in a vacuum, Your Honor, and we cited in our brief cases that say, you know, one racial epithet, you know, while it is regrettable, of course, is not enough to establish a hostile work environment. And as I begin my argument, I think Judge Park really hit the nail on the head, because if that comment is related to the pre-bankruptcy conduct, and if the plaintiff urges this, or excuse me, Ms. Black urges this Court to consider all the pre-bankruptcy conduct in determining whether it led to a constructive discharge claim, then the constructive discharge claim is necessarily related to the pre-bankruptcy conduct, and Ms. Black is a stop from bringing it, and that is Stephen's case we cited to in our brief, Your Honor. In that case, the Court held that even though the constructive discharge claim, you know, allegedly approved after the bankruptcy was closed, that conduct was substantially related enough that the plaintiff was barred under the doctrine of judicial estoppel from bringing the constructive discharge claim, because she did not disclose it to the bankruptcy court before she was granted the discharge. So I think Judge Park did hit the nail on the head, either with respect to the comment made by Mr. Loprest that that plaintiff identifies in her letter of resignation ultimately led to her discharge. If it is substantially related to the pre-bankruptcy conduct, and the Court considers the pre-bankruptcy conduct, then the plaintiff is barred under judicial estoppel or lax standing to pursue the claim. It sounds a little bit like you're trying to have it both ways now, too. Just because it's related conduct doesn't immunize you from something post-bankruptcy because there's something you could point to pre-bankruptcy that was similar to it. I mean, it seems like the district court got it right. If it was pre-bankruptcy and it wasn't enough to state a claim then, then that's not something we consider factually. But anything that happens afterwards factually, if it gives rise to hostile work environment claim, then we'll assess that on the merits. But you don't then get to resurrect pre-bankruptcy conduct to add on to that issue. Yes, Judge Park, I agree. It's our position the district court was correct in looking at the comment by Mr. LaPrest. It sounded like you're making a different argument. It's ruling on the merits. Oh, I apologize. I didn't mean to cut you off, Judge Park. No, I think you explained it. It sounded to me like you're making a different argument, so I was just trying to clarify that. Oh, I apologize. And I would say with respect to the constructive discharge claim on the basis of gender, appellees take the position that the district court was also correct in determining that based on plaintiff's own resignation letter, gender did not have an impact on her decision to resign from employment. It was specifically related to the comment made by Mr. LaPrest. If the judges have no further comments for me, I would like to conclude at this time. Thank you very much for your time. Thank you. We'll hear rebuttal. Your Honor, first, I would think I would start it to say this, like in an abundance of caution, we have retained a, my client has retained a bankruptcy attorney who has filed a motion to reopen, which will be tomorrow. I personally, but there's no... I'm sorry, could you speak up a little bit? In an abundance of caution, we filed, we retained a bankruptcy attorney. I have no bankruptcy expertise, but who said in an abundance of caution, we filed a motion to re-argue an amended schedule. That is on the calendar for tomorrow. You have the bankruptcy number in the papers, so you can, you know, judicial notice of what occurs. I personally spoke to the trustee who was the trustee during the original proceeding. It may or may not be the trustee, but I'm not sure. I spoke to the trustee once it's, you know, the judge appoints it. You see in Buffalo, the bankruptcy, other bankruptcy judges retiring, so the one Vermont judge is coming in once a month. So that's why it's tomorrow. Vermont, right? What? From Vermont. I'm not sure if he's from Vermont. I didn't ask that part, but I know he's only doing it once. So, and from what I know, what happens with the trustee told me, and I do have an email from the trustee, which he said I could give to the court. I did call the case manager to see if I should file it. I didn't know what to do, and I didn't want to be disrespectful. And she said, because an order hadn't been issued or anything, that perhaps we should wait for the order, because the order will tell you what the bankruptcy court's doing, and that's fine with me. I just want to put you on notice of it. And he told me... Let me just ask a simple question. Is it, what is the status of the bankruptcy proceeding now? Right now, there is a motion to reopen, which is going to be determined tomorrow by the judge. But the bankruptcy trustee, and he sent me an email, told me is that the bankruptcy motion to reopen is pending for Justice Warren. The hearing is set for June 16, 2022. He said that, the trustee told me, that there is no opposition to the reopening, because it'd be a debtor that would be opposed, and why would a debtor oppose it, right? So, when the reopening, the case is granted, it's docketed, and the trustee will, the trustee's he's seeking to move forward to retirement, so he may or may not be assigned to this case. He doesn't know. But he said what happens is, that once that happens, the order reopening can be expected to take a day or two after the hearing and the assignment of a trustee within a day or two after that. And once it's reopened, the trustee will prepare and file an application to employ a special counsel, our firm, to act on their behalf. And then, what happens is, he said once every six or eight, we have to fill out some paper that we file, and then he said that will be approved, and then what happens is, we have to just report to them every six or eight months about what's happening. And I've had cases where bankruptcy has been involved, and you can't settle the case without them, you know, issue a check. We're talking $10,000. I mean, this is not the cases they're talking about where somebody's got $120,000 and trying to defraud the bankruptcy thing. I mean, $10,000, that's what they have an interest in. So that motion is pending. Thank you for advising us of that. Okay. And then a couple, just a couple other things I wanted to bring to the court's attention. The crucial part of this case is the difference between rooted, for bankruptcy purposes, rooted, and substantially related. If, in fact, this court says that because she knew some things, but remember, she couldn't come to this court. If I went to court with what she knew before, the Seminole Act, you'd kick me out. I read your cases. I read 58 cases of yours for the past period of May 1 of 2021 to May 1 of now. The point is that it wasn't enough. So does that give not only the opportunity, does that mean that bankruptcy attorneys are going to have to tell their clients, is there anything at your workplace that you think is, and I'll tell you, there's going to be a lot of people saying a lot, are those cases going to remain open until a Seminole Act occurs a year or two later, that then under Morgan can relate back? I mean, it's just, it doesn't make any logical sense to me. Thank you, Ms. Greco. We have your argument, and you made that point very ably in your brief. Sorry. Thank you both, and we'll take the matter under advisement. Thank you, Your Honor. Thank you.